UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ARTHUR WEST**,<br><br>Plaintiff,<br><br>v.<br><br>**NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, *et al.***,<br><br>Defendants. | Case No. 24-cv-3143 (CRC) |

**MEMORANDUM OPINION**

The Washington State Capitol complex in Olympia abuts Capitol Lake. The lake was created in 1951 following the construction of the 5th Avenue Dam, which blocked the Deschutes River from flowing into the Budd Inlet to the north. In 2016, the State of Washington embarked on the Deschutes Estuary Project to remove the dam and restore the natural ecosystem and tidal flows between the river and the inlet. Primary responsibility for the project lies with various Washington state agencies and partners, including the Squaxin Island Tribe, and the bulk of the funding to date has come from state sources. In 2024, however, the Tribe and a Washington state agency received approximately $6.4 million in federal funding through a cooperative agreement with the National Oceanic and Atmospheric Administration ("NOAA") for conceptual-design work on the project. That agreement did not fund any construction activities, and no construction work on the project has begun. Separately, state and local authorities are in the planning stage of an environmental cleanup project in Budd Inlet, which has received no federal funding to date.

Plaintiff Arthur West lives in the Olympia area and opposes the Deschutes Project. He claims that removing the dam will result in a variety of harms to nearby waters and fish and

wildlife habitats. Characterizing the project and the Budd Inlet remediation effort as a single undertaking, West challenges several actions taken by federal and state agencies, as well as a funding provision passed by the Washington State Legislature, that he claims violated the National Environment Procedure Act ("NEPA") and its Washington State counterpart. West seeks an injunction barring any further obligation or expenditure of funds related to the projects until a full federal environmental impact statement has been prepared that addresses effects on the surrounding ecosystem.

The federal and state defendants have each moved to dismiss the complaint. The Court will grant both motions. West lacks standing to bring his claims against the federal defendants because he has not shown that the one federal agency action he identifies—the NOAA cooperative agreement—is sufficiently connected to his claimed injuries. And his claims against the state defendants either fail on standing grounds or fail to advance a federal cause of action that can be heard in this Court.

## I. Background

### A. Factual Background

The Court draws the following background from the allegations in West's Second Amended Complaint ("SAC"), which the Court must take as true at the motion-to-dismiss stage; information posted on official government websites of which the Court may take judicial notice; and, for purposes of assessing standing, undisputed facts contained in exhibits attached to the federal defendants' motion to dismiss. See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (providing that a complaint's factual allegations must be taken as true when evaluating a motion to dismiss); Pharm. Rsch. & Mfrs. of Am. v. HHS, 43 F. Supp. 3d 28, 33–34 (D.D.C. 2014) (noting that courts in this District frequently take judicial notice of official

governmental websites and collecting cases); Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005) (explaining that "the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction," so long as it "still 'accept[s] all of the factual allegations in [the] complaint as true'" (second alteration in original) (quoting United States v. Gaubert, 499 U.S. 315, 327 (1991))).

The Deschutes Project involves the removal of the 5th Avenue Dam, which was constructed in 1951 and bars tidal exchange between the Deschutes River and Budd Inlet. See Final EIS Oct. 2022: Ch. 1—Introduction, Project Background, & Hist., Capitol Lake–Deschutes Estuary Long-Term Mgmt. Project at 1-1 (Oct. 2022), https://deschutesestuaryproject.org/wp-content/uploads/2023/11/Capitol-Lake-Deschutes-Estuary-Final-EIS-2-Chapter-1.pdf [https://perma.cc/BR5L-UFM3]. The Project aims to "identify and implement an environmentally and economically sustainable long-term management alternative that improves water quality and manages existing sediment accumulation and future deposition," as well as to "improve the impaired ecological functions" within the area. Id. Between 2018 and 2022, the Washington State Department of Enterprise Services ("DES") evaluated "the potential impacts and benefits of three long-term management action alternatives and a no action alternative" and issued an Environmental Impact Statement ("EIS") in October 2022, identifying what is called the Estuary Alternative "as the preferred alternative for long-term management." Wash. State Dep't of Ecology & Dep't of Enter. Servs., History, Deschutes Estuary Restoration Project, https://deschutesestuaryproject.org/history [https://perma.cc/K75G-THYP] (last visited Sept. 15, 2026). Until July 2025, DES served as the lead agency on the Project. See Second Am. Compl., ECF No. 24 ("SAC") ¶ 4.19C. The Washington State Legislature has since transferred management of the Project to the Washington State Department of Ecology ("DOE"). See id.

Mr. West lives in Olympia on property located approximately one mile from the Deschutes Project. See id. ¶ 3.4. His residence also "overlook[s] . . . the Bud[d] Bay Dioxin Remediation Sites." Id. ¶ 3.1. These sites comprise the Budd Inlet Cleanup and Restoration Project ("Budd Inlet Project"), an ongoing effort led by the Port of Olympia to address contaminated sediment in the Budd Inlet, the southernmost arm of Puget Sound. See Budd Inlet Cleanup and Restoration, Port of Olympia, https://portolympia.com/buddinlet [https://perma.cc/CL5V-WVG7] (last visited Sept. 15, 2026). The Budd Inlet Project is still in the project-design phase to determine "the best way to clean up and restore" the inlet, with construction work projected to begin in 2027. Id. The Port of Olympia is "actively looking to secure funding for the cleanup and restoration work through available grants" and has identified "[s]everal potential sources of funding." Id. The Budd Inlet Project is distinct from the Deschutes Project, although work on the latter will impact water flow in the Budd Inlet, likely implicating the cleanup and restoration efforts. See id.

West refers to the two projects collectively and says he "traverses the project site on a daily basis" and "regularly employs" the surrounding areas "for recreation and other activities," SAC ¶ 3.1, including walking on an existing trail and driving across the bridge atop the 5th Avenue Dam, see id. ¶ 3.4. West also reports that he "holds a current salt water fishing license, employs lower Budd [I]nlet for waterborne and water related recreation, and frequents restaurants located on the inlet in the vicinity of the project site." Id. ¶ 3.5. West thus alleges that he is affected by the water quality in the Puget Sound. See id.

Based on the proximity of his residence to the project sites and his various uses of the area, West challenges actions taken by NOAA, the United States Army Corps of Engineers ("Army Corps"), and the United States Department of Commerce (collectively, "Federal

Defendants"), as well as DES, DOE, and the State of Washington (collectively, "State Defendants"), which he claims were completed without complying with the procedural requirements of NEPA. See id. ¶¶ 1.1–1.3, 3.8. In particular, West contends that "the advancement of the Capitol Lake–Deschutes Estuary Restoration Project and the Budd Inlet Remediation Project" are "inextricably interrelated and, singly and collectively, constitute a 'Major Federal Action.'" Id. ¶ 1.1. He proceeds to identify three actions by Federal and State Defendants that form the basis of four claims for injunctive and declaratory relief: (1) a 2023 cooperative agreement between NOAA and the Squaxin Island Tribe; (2) a 2025 budgetary provision enacted by the Washington State Legislature; and (3) Letters of Intent ("LOIs") executed by Washington State agencies. The Court elaborates on each below.

*1. NOAA Cooperative Agreement*

In 2023, the Squaxin Island Tribe applied for funding from NOAA related to the Deschutes Project, for the specified purpose of supporting "project design, permitting, and communication and outreach" under a cooperative agreement. Fed. Defs.' Mot. to Dismiss Pl.'s Second Am. Compl., ECF No. 28 ("Fed. Defs.' Second MTD"), Ex. 1, PDF 1 – Project Summary and Narrative at 2. Based on that application, NOAA granted $6,437,390 to the Tribe, SAC ¶ 4.12, with $5,904,354 of that amount going to DES as a sub-award, Fed. Defs.' Second MTD, Ex. 1, PDF 2 – Budget Narrative at 12. Before approving the Cooperative Agreement, NOAA conducted a NEPA analysis and determined that the "proposed planning and design activities are fully consistent with activities described" in NOAA's June 2015 Programmatic Restoration Center EIS. Fed. Defs.' Second MTD, Ex. 2 ("NEPA Inclusion Analysis") at 1. This EIS is a "programmatic-level environmental analysis" that NOAA uses "to approve . . . site-specific actions, including grant actions," when the action is "within the range of alternatives and

scope of potential environmental consequences, and does not have significant adverse impacts." Fed. Defs.' Second MTD, Ex. 3 at x.

The funding under the Cooperative Agreement is exclusively intended "to complete conceptual design (30%) for transportation and restoration elements, and to advance restoration design details so that [the Project] is permit-ready (60%)." NEPA Inclusion Analysis at 1. "[N]o construction will occur under [the] agreement." Id. NOAA's NEPA Inclusion Analysis further clarifies that "[t]he outcome of the design [under the Cooperative Agreement] does not commit NOAA to a future action, and all future actions will be evaluated for potential effects on the human environment." Id. at 2.

West contends that the Cooperative Agreement constitutes a "Major Federal Action" because the "award carried substantial federal involvement, including NOAA's review of design plans, permitting assistance, and monitoring." SAC ¶ 4.12. As a result, he alleges, the Cooperative Agreement violates the APA and NEPA because NOAA and the Army Corps "failed to ensure that NEPA review was conducted before awarding and obligating federal funds for the Deschutes Estuary Restoration Project, including the $6,437,390 NOAA award that committed resources to design, permitting, and staffing." Id. ¶ 5.1.4. West claims this failure caused him environmental, procedural, and informational injuries. See id. ¶ 5.1.8.

*2. 2025 Washington State Legislature Budget Provision*

In 2025, the Washington State Legislature enacted a provision in its annual budget that appropriated $14.75 million for the Deschutes Project ("Section 3031"). SAC ¶ 4.20. Section 3031 "also transferred primary responsibility for the project from the Department of Enterprise Services (DES) to the Department of Ecology (DOE)." Id. ¶ 4.21 (emphasis omitted). The funding under Section 3031 consists of $8 million to DOE for design work on the Deschutes

Project that includes "a recommended series of projects phased over several biennia with defined deliverable outcomes that move the state forward to a completed estuary" and "identif[ies] expected timelines, estimated expenditures, and opportunities for non-state matching fund sources"; $4 million for the development and implementation of a "lake management plan"; $2 million for "any necessary land acquisition"; and $750,000 for "project management costs." Pl.'s Mot. to Suppl. the R. & for Judicial Notice of Adjudicative Facts, ECF No. 20 ("Pl.'s Mot. to Suppl. & for Judicial Notice"), Ex. B at 2–3.

West contends that "Section 3031 attempts to accomplish indirectly what NEPA forbids" by "requir[ing] DOE to rely on 'past reports and studies,' to consider existing stakeholder input, and to adopt a phased restoration design limited to certain predefined project elements." SAC ¶ 4.22. West also posits that Section 3031 improperly "fragments the project into artificial phases, treating bridge removal, estuary re-engineering, and lake management as if they were discrete actions." Id. ¶ 4.25. Based on those assertions, West contends that Section 3031 "unlawfully advance[s] a Major Federal Action without the required NEPA . . . review," id. ¶ 4.32, and violates NEPA by "appropriating funds and dictating project elements" before engaging in the required review, id. ¶ 5.2.3, improperly fragmenting review, id. ¶ 5.2.4, and improperly relying on outdated studies, id. ¶ 5.2.5.

*3. Letters of Intent Executed by Washington State Agencies*

Next, West maintains that "[i]n parallel with Section 3031, DES and DOE executed Letters of Intent (LOIs) and interlocal agreements with municipalities and the Squaxin Island Tribe," which "lock in the 'Estuary Alternative' as the preferred and only feasible outcome, and obligate participants to funding, design, and phasing commitments—all before any NEPA or SEPA [State Environmental Policy Act] documentation was prepared." SAC ¶ 4.28 (emphasis

omitted). West highlights a "pre-proposal to the National Coastal Resilience Fund (NCRF)" that was submitted by DES in 2024, "seeking an additional $1,000,000 in grant funds and identifying more than $50.7 million in matching contributions and related federal funding requests to support expanded design and construction of the Deschutes Estuary Restoration Project." Id. ¶ 4.33 (emphasis omitted). The NCRF "is a partnership between the National Fish and Wildlife Foundation and NOAA." Off. for Coastal Mgmt., National Coastal Resilience Fund, NOAA, https://www.coast.noaa.gov/funding/bil/ncrf/overview.html [https://perma.cc/8NMV-CG5A] (last visited Sept. 22, 2026). This LOI lists multiple matching contributions, including non-federal appropriations and federal funds for which DES has applied but has not yet received. See Pl.'s Reply to Fed. Defs.' First Mot. to Dismiss, ECF No. 17, Decl. of Arthur S. West re Standing & Expanded Scope of Project, Ex. 1 ("National Fish & Wildlife Foundation Pre-Proposal") at 3–5.

According to West, the LOI "candidly admits that DES intends to formally merge a new flood-protection berm project into the estuary restoration, despite earlier representations that the berm was a separate undertaking." SAC ¶ 4.34 (emphasis omitted). Moreover, he alleges that the "proposal seeks to leverage multiple new federal grants to support the expanded scope," including several NOAA grants. Id. ¶ 4.35 (emphasis omitted). As such, West believes that the "LOI documentation discloses an intent to secure nearly $50.7 million in additional federal and state funds to advance expanded design and construction phases." Id. ¶ 4.36 (emphasis omitted). West views this LOI—and other unspecified LOIs—as a "Major Federal Action" requiring compliance with NEPA. Id. ¶ 4.32. And these LOIs violate NEPA, in his view, because "these major additions were never subjected to a Supplemental EIS or even disclosed as part of NEPA scoping." Id. ¶ 4.37.

B. Procedural History

West filed this suit in October 2024, bringing claims against NOAA, DES, the State of Washington, and the Squaxin Island Tribe under the APA and the Declaratory Judgment Act. See Compl., ECF No. 1 ¶¶ 3.7–3.10, 5.1–5.2. Less than two months later, West filed an amended complaint, adding the U.S. Department of Commerce and the Army Corps as defendants. See Am. Compl., ECF No. 2 ¶¶ 3.8, 3.10. DES filed an answer to the amended complaint several weeks later. See Def. Wash. State Dep't of Enter. Servs.' Answer to Pl.'s First Am. NEPA Compl., ECF No. 5. In January 2025, West voluntarily dismissed the Squaxin Island Tribe. Pl.'s Mot. to Extend Time, ECF No. 6 at 2 n.1. That June, NOAA, the Army Corps, and the U.S. Department of Commerce filed a motion to dismiss the amended complaint, see Fed. Defs.' Mot. to Dismiss Pl.'s Am. Compl., ECF No. 11, which DES and the State of Washington adopted, see Wash. State Defs.' Joinder in Fed. Defs.' Mot. to Dismiss, ECF No. 13. West also moved to supplement the record and for the Court to take judicial notice of the state budget appropriation. See Pl.'s Mot. to Suppl. & for Judicial Notice at 1. The Court denied the initial motions to dismiss as moot after it granted West leave to file the SAC. See Min. Order (Sept. 23, 2025).

The SAC adds DOE as a defendant. See SAC ¶ 3.12. It also includes new claims about the 2025 Washington State budget provision and certain alleged "misrepresentations and omissions" by State Defendants in their previous joinder adopting Federal Defendants' first motion to dismiss. See id. ¶¶ 4.19A–4.50, 5.2.1–5.2.9, 5.4.1–5.4.11. In November 2025, one year after filing his initial complaint, West filed a motion for a preliminary injunction, see Pl.'s Mot. for a Prelim. Inj., ECF No. 27, which the Court held in abeyance pending its ruling on

Federal Defendant's then-forthcoming motion to dismiss the SAC, see Min. Order (Nov. 26, 2025).

In December 2025, Federal Defendants filed the present motion to dismiss the SAC on the grounds that (1) the Court lacks subject matter jurisdiction because West does not have standing to sue; and (2) West has failed to state a claim against the Army Corps under Rule 12(b)(6) because he has not identified any final agency action.[1] See Fed. Defs.' Second MTD at 6. State Defendants again adopted Federal Defendants' motion to dismiss, asserting that the standing arguments advanced by Federal Defendants "apply to the entirety of the Second Amended Complaint, to include claims, to the extent they are made, against State Defendants." Wash. State Defs.' Joinder in Fed. Defs.' Mot. to Dismiss, ECF No. 34 ("State Defs.' Second MTD") at 2. The motion to dismiss is fully briefed and ripe for decision.[2]

## II. Legal Standards

### A. Dismissal Under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction

The Court must dismiss a case over which it lacks subject matter jurisdiction. See Hancock v. Urb. Outfitters, Inc., 830 F.3d 511, 513 (D.C. Cir. 2016) (explaining that a court "cannot proceed at all in any cause" if it determines that it lacks subject matter jurisdiction (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998))); Fed. R. Civ. P.

---

[1] Because the Court will grant Federal Defendants' motion to dismiss on standing grounds, it will not address the argument that West failed to state a claim against the Army Corps.

[2] As indicated by the foregoing procedural history, also before the Court are West's Motion for a Preliminary Injunction and Motion to Supplement the Record and for Judicial Notice of Adjudicative Facts. Because the Court will grant Federal Defendants' motion to dismiss and State Defendants' joinder adopting Federal Defendants' motion and dismiss the remaining claims *sua sponte* under Rule 12(b)(6) for failure to state a claim, the Court will deny both of West's outstanding motions as moot.

12(b)(1), (h)(3). It is the plaintiff who "bears the burden of invoking the court's subject matter jurisdiction, including establishing the elements of standing." Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015). To meet this burden, the plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). On a motion to dismiss for lack of standing, this means the complaint "must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." Humane Soc'y of the U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015); see also Jibril v. Mayorkas, 20 F.4th 804, 814 (D.C. Cir. 2021) ("At the pleading stage, plaintiffs are required only to state a *plausible* claim that each of the standing elements is present." (internal quotation marks omitted)). In assessing whether it has subject matter jurisdiction, the Court must "accept facts alleged in the complaint as true and draw all reasonable inferences from those facts in plaintiffs' favor," Humane Soc'y of the U.S., 797 F.3d at 8, although it may "consider materials outside the pleadings" as well, Jerome Stevens Pharms., Inc., 402 F.3d at 1253.

B. Dismissal Under Rule 12(b)(6) for Failure to State a Claim

Dismissal under Rule 12(b)(6) is appropriate when the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss for failure to state a claim, the Court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015). However, a court need not accept inferences drawn by the plaintiff that are unsupported by facts alleged in the complaint, nor accept a plaintiff's legal conclusions as true. See Browning v. Clinton, 292

F.3d 235, 242 (D.C. Cir. 2002). The complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Banneker Ventures, LLC, 798 F.3d at 1129 (internal quotation marks omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

The Court may dismiss a complaint *sua sponte* under Rule 12(b)(6) "where it is 'patently obvious' that the plaintiff cannot prevail on the facts alleged in the complaint." Cheeks v. Fort Myer Constr. Co., 722 F. Supp. 2d 93, 112 (D.D.C. 2010) (quoting Baker v. Dir., U.S. Parole Comm'n, 916 F.2d 725, 726–27 (D.C. Cir. 1990) (per curiam)); see also Wilson v. Obama, 770 F. Supp. 2d 188, 190 (D.D.C. 2011) ("The Court may dismiss a complaint *sua sponte* under Rule 12(b)(6) 'whenever the plaintiff cannot possibly win relief.'" (quoting Best v. Kelly, 39 F.3d 328, 331 (D.C. Cir. 1994))). This includes when a plaintiff lacks a valid cause of action, the proper remedy for which is dismissal of the complaint under Rule 12(b)(6). See Trudeau v. FEC, 456 F.3d 178, 188 (D.C. Cir. 2006) (explaining that whether a plaintiff has stated "claims 'upon which relief can be granted' depends in part on whether there is a cause of action that permits [the plaintiff] to invoke the power of the court to redress the violations of law" alleged); see also Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers, 414 U.S. 453, 456 (1974) ("[I]t is only if such a right of action exists that we need consider whether the respondent had standing to bring the action and whether the District Court had jurisdiction to entertain it."); Bell v. Hood, 327 U.S. 678, 682 (1946) ("[T]he failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.").

*C.* *Pro Se* Pleadings

When a plaintiff proceeds *pro se*, his complaint must be "liberally construed" and is "held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). The Court must

consider a *pro se* litigant's "filings as a whole before dismissing a complaint," including any opposition to a motion to dismiss. Schnitzler v. United States, 761 F.3d 33, 38 (D.C. Cir. 2014). Nevertheless, a *pro se* plaintiff must "meet his burden of proving subject matter jurisdiction to survive a Rule 12(b)(1) motion to dismiss." Smith v. Scalia, 44 F. Supp. 3d 28, 36 (D.D.C. 2014). And "'the complaint must still present a claim on which the Court can grant relief' to withstand a Rule 12(b)(6) challenge." Id. (internal quotation marks omitted) (quoting Budik v. Dartmouth-Hitchcock Med. Ctr., 937 F. Supp. 2d 5, 11 (D.D.C. 2013)).

## III. Analysis

In his SAC, West brings four claims for injunctive and declaratory relief. Three are brought under the APA to enforce NEPA; the remaining claim is brought under the Declaratory Judgment Act. First, West seeks injunctive and declaratory relief under the APA based on an alleged major federal action taken by Federal and State Defendants without engaging in the required NEPA analysis ("Claim I"). See SAC ¶¶ 5.1.1–5.1.9. Second, West seeks injunctive and declaratory relief under the APA for alleged violations of NEPA and SEPA stemming from a state budget provision that "appropriat[es] funds and dictat[es] project elements" ("Claim II"). Id. ¶ 5.2.3.[3] Third, West seeks declaratory relief under the Declaratory Judgment Act based on the alleged actions of both Federal and State Defendants related to the Deschutes Project ("Claim III"). See id. ¶¶ 5.3.1–5.3.8. Finally, West seeks injunctive and declaratory relief under the APA based on allegations that "the State materially misrepresented and concealed critical facts"

[3] While West styles Claim II as being brought under NEPA, NEPA itself "does not create a private right of action," so claims alleging violations of NEPA must instead be brought under the APA. Pub. Citizen v. Off. of U.S. Trade Representatives, 970 F.2d 916, 918 (D.C. Cir. 1992); see Karst Env't Educ. & Prot., Inc. v. EPA, 475 F.2d 1291, 1295 (D.C. Cir. 2007). The Court therefore treats Claim II as being brought under the APA.

in its "Joinder" adopting Federal Defendants' motion to dismiss in violation of NEPA ("Claim IV"). Id. ¶ 5.4.2.

As explained further below, the Court will dismiss Claim I for lack of subject matter jurisdiction on standing grounds; Counts II and IV for failure to state a claim because there is no valid cause of action; and Count III because Counts I, II, and IV must be dismissed and the Declaratory Judgment Act alone cannot confer subject matter jurisdiction or an independent cause of action.

A. Claim I: Violations of the APA and NEPA

West brings Claim I under the APA, alleging that both Federal and State Defendants have violated the APA and NEPA by "tak[ing] major federal actions significantly affecting the quality of the human environment without preparing an Environmental Impact Statement (EIS) or supplementing existing analysis as required by NEPA." SAC ¶ 5.1.3. West contends that Federal Defendants prematurely approved the Cooperative Agreement without adequate review under NEPA, id. ¶ 5.1.4, and that State Defendants "obligated federal and state funds, entered into binding agreements, and predetermined outcomes" without NEPA review, id. ¶ 5.1.5.[4]

[4] The Court only addresses Claim I against Federal and State Defendants as it relates to their grant and acceptance, respectively, of funding through the Cooperative Agreement. To the extent the claim challenges other actions by State Defendants—such as the LOIs and Section 3031—those are addressed below for failure to state a claim under Rule 12(b)(6). See infra Section III.B. The Court takes this approach because those actions implicate whether West has a cause of action at all under the APA, and "it is only if such a right of action exists" that the Court should "consider whether the [plaintiff] ha[s] standing to bring the action." Nat'l R.R. Passenger Corp., 414 U.S. at 456. Because the Cooperative Agreement itself can be construed as a major federal action under NEPA, there is at least a cognizable cause of action under the APA as to State Defendants. See 42 U.S.C. § 4336e(10)(A) (defining "major Federal action" as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility"); id. § 4336e(10)(B)(i) (excluding from the definition of "major Federal action" any "non-Federal action" with either "no or minimal Federal funding" or "no or minimal Federal involvement where a Federal agency cannot control the outcome of the project"). And the Court does not construe any challenge to the LOIs and Section 3031 as a claim against Federal

Federal Defendants argue that West's claims against them should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) because West lacks standing. See Fed. Defs.' Second MTD at 6. State Defendants adopt Federal Defendants' arguments as applied to the claims against them. See State Defs.' Second MTD at 2. The Court concludes that (1) West lacks standing to assert his first claim against Federal and State Defendants under the APA and, independently, (2) his claim is not prudentially ripe to the extent it is founded on environmental injuries.

---

Defendants. To be sure, West's opposition brief does suggest that those actions can be attributed to Federal Defendants, despite the absence of any explicit allegations in the SAC. See, e.g., Pl.'s Opp'n to Fed. Defs.' Second Mot. to Dismiss, ECF No. 35 ("Pl.'s Opp'n") at 6, 11–12, 14, 18, 26. While the Court must consider the allegations in the opposition brief in ruling on West's motion to dismiss, that does not mean the Court must accept unsupported inferences. Accordingly, because West's own filings contradict the conclusion that the LOIs and Section 3031 constitute actions by Federal Defendants, see, e.g., Pl.'s Mot. to Suppl. & for Judicial Notice, Ex. B; National Fish & Wildlife Foundation Pre-Proposal, the Court will not address those arguments in assessing Claim I.

Similarly, the Court will only briefly address here any potential future permits by the Army Corps. It is unclear from the SAC whether West specifically challenges any such permits. Compare SAC ¶ 4.5–4.6 (discussing statements by the Army Corps related to possible permitting that would be required under 33 U.S.C. § 408), with id. ¶ 5.1.4 (mentioning only that the Army Corps "failed to ensure that NEPA review was conducted before awarding and obligating federal funds for the Deschutes Estuary Restoration Project, including the . . . NOAA award"), and Pl.'s Opp'n at 22–24 (responding to Federal Defendants' argument that West fails to state a claim against the Army Corps under Rule 12(b)(6)). For that reason, the Court's analysis will only discuss West's claims pertaining to the Cooperative Agreement. However, as Federal Defendants note, West "does not allege any action by the Corps whatsoever, much less one that could cause the environmental injuries alleged." Fed. Defs.' Second MTD at 8. Therefore, there is no "Case[]" or "Controvers[y]" under Article III of the Constitution for the Court to decide, nor could such a potential action be considered prudentially ripe since there are no facts from which the Court could reach a decision. The Court declines to consider any hypothetical future action by the Army Corps that may or may not come to pass. To the extent West does make a separate claim related to permitting by the Army Corps, that claim must be dismissed for lack of subject matter jurisdiction.

*1. Standing*

Under Article III of the Constitution, federal courts only have jurisdiction to resolve "Cases" and "Controversies," meaning that "the plaintiff must have a 'personal stake' in the case—in other words, standing." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021) (quoting Raines v. Byrd, 521 U.S. 811, 819 (1997)). Constitutional standing "consists of three elements," which the plaintiff "bears the burden of establishing." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). A plaintiff must demonstrate: (1) that he has "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) causation, meaning that his "injury is fairly traceable to the challenged action of the defendant"; and (3) redressability, meaning that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000). When, as here, the plaintiff seeks declaratory and injunctive relief rather than monetary damages, he "must show he is suffering an ongoing injury or faces an immediate threat of injury." Dearth v. Holder, 641 F.3d 499, 501 (D.C. Cir. 2011). Because "standing is not dispensed in gross," the plaintiff "must demonstrate standing for each claim that [he] press[es] and for each form of relief that [he] seek[s] (for example, injunctive relief and damages)." TransUnion LLC, 594 U.S. at 431.

West identifies three categories of injuries that he maintains are sufficient to sustain constitutional standing for his APA claim: (1) environmental injuries; (2) procedural injuries; and (3) informational injuries. See SAC ¶¶ 1.6, 5.1.8. The Court takes up each in turn.

a. Environmental Injuries

West alleges that the NOAA Cooperative Agreement will cause "concrete environmental injuries to his aesthetic, recreational, birdwatching and environmental interests in the Deschutes

Estuary and Budd Inlet due to the foreclosure of alternatives in the defendants' project and the imminent prospect of construction activity under the new project schedules." SAC ¶ 1.6. Notwithstanding that both projects seek to benefit the natural environment of the area, West asserts that they will actually result in environmental harms. Specifically, West contends that Defendants' actions "threaten[] to disturb and mobilize dioxin-contaminated sediments in Budd Inlet, alter hydrodynamic conditions, degrade dissolved oxygen levels, interfere with existing and planned toxic-sediment remediation, and harm fish, birds, and nearshore habitat." Pl.'s Opp'n to Fed. Defs.' Second Mot. to Dismiss, ECF No. 35 ("Pl.'s Opp'n") at 10; see also id. at 15–16 (laying out these harms in further detail). To be sure, courts have long held that aesthetic, recreational, and environmental injuries can constitute a concrete, particularized injury in fact. See id. at 10 (citing Friends of the Earth, Inc., 528 U.S. at 183–84; Sierra Club v. Morton, 405 U.S. 727, 734–35 (1972)). West's alleged environmental injuries fail to confer standing here, however, because he cannot demonstrate that Defendants' actions will cause those injuries, or that any decision from this Court would redress them.

The causation element of Article III standing requires the plaintiff to "establish that [his] injury likely was caused or likely will be caused by the defendant's conduct." FDA v. All. for Hippocratic Med., 602 U.S. 367, 382 (2024). When the plaintiff is challenging "the government's 'unlawful regulation (or lack of regulation) of *someone else*,'" causation may be more difficult to establish. Id. (quoting Lujan, 504 U.S. at 562). The more indirect the causal chain is between the plaintiff's alleged injury and the challenged action, the more difficult it is to meet the minimum constitutional standing requirements for causation. See Warth v. Seldin, 422 U.S. 490, 505 (1975). Ultimately, "to establish causation, the plaintiff must show a predictable

chain of events leading from the government action to the asserted injury." All. for Hippocratic Med., 602 U.S. at 385.

West cannot establish causation because the environmental injuries he predicts would result from construction work on the Deschutes Project that is to be completed in the future, if at all, and the only federal action he identifies—the NOAA Cooperative Agreement—explicitly does not fund any construction activities. Funding under the Cooperative Agreement is instead designed "to complete conceptual design . . . for transportation and restoration elements, and to advance restoration design details so that [the Project] is permit-ready." NEPA Inclusion Analysis at 1. As explained by Federal Defendants, "[n]one of the activities funded under the Cooperative Agreement could be the cause of any construction-based impacts to aesthetic and recreational use of the site, birdwatching, water quality, or sediment remediation in Budd Inlet." Fed. Defs.' Second MTD at 8. The Cooperative Agreement "does not provide any funds for removal of the dam," id. at 9, and even if NOAA later received an application for funding construction related to the dam's removal, "[t]he outcome of the design [under the Cooperative Agreement] does not commit NOAA to a future action, and all future actions will be evaluated for potential effects on the human environment," NEPA Inclusion Analysis at 2. West himself seems to acknowledge as much in his opposition brief. See, e.g., Pl.'s Opp'n at 10 (attributing his "imminent and continuing injury" to the "consolidated estuary restoration and berm project" rather than to activities funded through the Cooperative Agreement).[5]

[5] Perhaps for this reason, West argues in his opposition that his injuries are traceable to Federal Defendants' actions not only because of allegations related to the Cooperative Agreement, but also because "Federal Defendants have coordinated with state agencies implementing SB 5195 § 3031, consolidated the berm design into the project, and advanced Letters of Intent seeking approximately $50.7 million in additional funding." Pl.'s Opp'n at 11–12. While the Court must assess West's opposition in examining the viability of his claims, the Court need not accept his inferences when they are unsupported by the facts alleged. Because

West responds that injury under NEPA does not necessarily require that "physical construction is imminent or underway." Id. at 4. True enough. But the causal chain between West's alleged injuries and any eventual construction still "rel[ies] on the speculation that various different groups of actors . . . might act in a certain way in the future." Ctr. for Biological Diversity v. U.S. Dep't of Interior, 563 F.3d 466, 479 (D.C. Cir. 2009). For example, causation here depends on the state actors receiving permitting approval from various federal, state, and local agencies, which is not guaranteed even if the current stated goal is to remove the 5th Avenue Dam. See Wash. State Dep't of Ecology & Dep't of Enter. Servs., History, supra ("Permits from federal, state, and local agencies are needed before construction can begin."); Wash. State Dep't of Ecology & Dep't of Enter. Servs., Design Coordination, Deschutes Estuary Restoration Project, https://deschutesestuaryproject.org/design-coordination [https://perma.cc/9JV3-RV2J] (last visited Sept. 21, 2026) (providing a project timeline indicating that the agency review and permitting process did not begin until the third quarter of 2025—after West filed suit—and is not anticipated to conclude until at least 2027). And any causal chain that West may establish "fails to take into account that" there are future steps in the process before construction begins which will be subject to "additional analyses [that] could scuttle [the Project] if the environmental effects . . . are found to be excessive." Ctr. for Biological Diversity, 563 F.3d at 479. State agencies will need to receive permits based on the designs developed under the Cooperative Agreement, through a separate approval process subject to additional analyses, before embarking on any construction. Therefore, West cannot demonstrate that his anticipated environmental injuries are fairly traceable to NOAA's

the facts in the SAC and West's filings—including his exhibits, see, e.g., Pl.'s Mot. to Suppl. & for Judicial Notice, Ex. B; National Fish & Wildlife Foundation Pre-Proposal—contradict these inferences, the Court does not consider them in its analysis here.

Cooperative Agreement as opposed to future construction that may or may not come to fruition, making causation too attenuated to support standing.

Even if West could establish causation, he cannot show that his claimed environmental injuries would be redressed by either injunctive or declaratory relief. Redressability focuses on whether the relief that the plaintiff seeks "will likely alleviate the particularized injury alleged by the plaintiff." Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663–64 (D.C. Cir. 1996); see Diamond Alt. Energy, LLC v. EPA, 606 U.S. 100, 111–12 (2025). Generally, the causation and redressability prongs of standing are "flip sides of the same coin." All. for Hippocratic Med., 602 U.S. at 380 (quoting Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 288 (2008)). However, "[t]here might be some circumstances in which governmental action is a substantial contributing factor in bringing about a specific harm, but the undoing of the governmental action will not undo the harm." Doc Soc'y v. Rubio, 141 F.4th 1273, 1278 (D.C. Cir. 2025) (quoting Renal Physicians Ass'n v. HHS, 489 F.3d 1267, 1278 (D.C. Cir. 2007)).

To the extent the Cooperative Agreement somehow contributes to West's feared injuries, this is such a case. West argues that "[d]eclaratory and injunctive relief requiring Federal Defendants to comply with NEPA before proceeding further would halt additional unlawful commitments of resources, require consideration of reasonable alternatives, and reduce the risk of environmental harm to waters Plaintiff uses." Pl.'s Opp'n at 12. But the relief West seeks cannot alleviate injuries to his recreational, aesthetic, and environmental interests. The only injunctive and declaratory relief that will redress these claimed harms is—seemingly—to prevent construction related to the Deschutes Project from happening at all. See SAC ¶ 1.6 (alleging that his injuries are "due to the foreclosure of alternatives in the defendants' project and the imminent prospect of construction activity under the new project schedules"); see also id. ¶ 3.5 (explaining

that West's environmental injuries are "threatened by the defendants' project"). But the Estuary Alternative with which West takes issue has been "identified as the preferred alternative" since October 2022, when DES published the 2022 Final EIS. Wash. State Dep't of Ecology & Dep't of Enter. Servs., History, supra. And West himself acknowledges that alternative has been "lock[ed] in" by various state-agency actions. SAC ¶ 4.28. As a result, issuance of equitable relief by this Court stemming from work on conceptual-planning and design activities funded by the NOAA Cooperative Agreement would not—and could not—redress West's claimed environmental injuries. All that potential relief would do is require Federal Defendants to reassess the environmental effects of the federally funded design work and prevent State Defendants from using those federal funds in the interim. And because that design work is for the construction that state agencies already committed to several years ago after engaging in the requisite state-level NEPA process, the equitable relief that West seeks would not "require" the agencies to reconsider "reasonable alternatives" to the already-selected Estuary Alternative, nor would it alleviate any of the environmental injuries he now asserts. Pl.'s Opp'n at 12.

Because West cannot establish either that his alleged environmental injuries are fairly traceable to Federal and State Defendants' actions or that equitable relief would redress those injuries, he does not have Article III standing to challenge their conduct under the APA. Accordingly, the Court lacks subject matter jurisdiction over his claim based on his alleged environmental injuries.

b. Procedural Injuries

West also alleges that Defendants' conduct has caused him procedural injuries "through the denial of NEPA's guaranteed disclosures and participation rights." SAC ¶ 1.6. According to West, "Defendants have denied that right by tiering to a decade-old, non-project-specific

programmatic EIS . . . and by foreclosing meaningful consideration of reasonable alternatives." Pl.'s Opp'n at 11.[6] The same hurdles West faced in alleging standing based on environmental injuries prevent him from demonstrating standing based on his claimed procedural injuries.

It is true that "'procedural rights' are special" insofar as "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." Lujan, 504 U.S. at 572 n.7. Yet for a procedural injury to confer standing, the plaintiff must still articulate "some concrete interest that is affected by the deprivation." Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."). He must also allege "a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to [his] particularized interest." Fla. Audubon Soc'y, 94 F.3d at 664; see also id. ("[T]he [Supreme] Court has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to [his] particularized interest."); Ctr. for L. & Educ. v. Dep't of Educ., 396 F.3d 1152, 1157 (D.C. Cir. 2005) ("Where plaintiffs allege injury resulting from violation of a *procedural* right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and

[6] West also alleges that Defendants have caused him a procedural injury "by consolidating new project elements such as the flood-protection berm without environmental review" and "by linking the initial approval to a project-defining State Budget Proviso." Pl.'s Opp'n at 11. However, these allegations pertain to the LOIs and Section 3031, not the Cooperative Agreement. For the reasons explained above, the Court does not consider these actions in its analysis of Claim I. See supra note 4.

redressability, *but not the issues of injury in fact or causation*." (second emphasis added)). It is not enough for the plaintiff to demonstrate "that the defendant's acts omitted some procedural requirement"—he must show "that it is substantially probable that the procedural breach will *cause* the essential injury to the plaintiff's own interest." Fla. Audubon Soc'y, 94 F.3d at 664–65 (emphasis added). When a plaintiff alleges a procedural injury under NEPA, "an 'adequate causal chain' contains two links: 'one connecting the omitted EIS to some substantive government decision that may have been wrongly decided because of the lack of an [adequate] EIS,' and 'one connecting that substantive decision to the plaintiff's particularized injury.'" Sierra Club v. FERC, 827 F.3d 36, 44 (D.C. Cir. 2016) (alteration in original) (quoting Fla. Audubon Soc'y, 94 F.3d at 668).

West's procedural-injury theory fails because he cannot demonstrate the second causal link connecting NOAA's decision to enter the Cooperative Agreement to his particularized injury. As explained above in the context of West's claimed environmental injuries, the Cooperative Agreement does not authorize construction, only conceptual-design work. See NEPA Inclusion Analysis at 1–2; see also id. at 2 ("The outcome of the design does not commit NOAA to a future action, and all future actions will be evaluated for potential effects on the human environment."). Nor does it affect State Defendants' ultimate decision whether to proceed with construction. Yet any injury that West may suffer would be the product of that future construction. Thus, even assuming that NOAA should have conducted a full-blown EIS before entering into the Cooperative Agreement, West is unable to demonstrate that its failure to do so makes any difference in whether State Defendants ultimately greenlight the Project.[7]

[7] This lack of causation distinguishes West from the hypothetical plaintiff described by the Supreme Court in Lujan. The Supreme Court explained that "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing

West's procedural-injury argument is therefore insufficient to confer standing, depriving this Court of subject matter jurisdiction.

c. Informational Injuries

Finally, West alleges that the NOAA Cooperative Agreement has caused him informational injuries "through the denial of NEPA's guaranteed disclosures and participation rights." SAC ¶ 1.6. Specifically, he argues that "NEPA confers a right to informed decision-making through the preparation of a lawful, project-specific environmental impact statement where required." Pl.'s Opp'n at 11.

An informational injury occurs "when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." FEC v. Akins, 524 U.S. 11, 21 (1998). To succeed on an informational-injury theory of standing, a plaintiff must allege that "(1) [he] has been deprived of information that, on [his] interpretation, a statute requires the government or a third party to disclose to [him], and (2) [he] suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." Friends of Animals v. Jewell, 828 F.3d 989, 992 (D.C. Cir. 2016) (citing Akins, 524 U.S. at 21–22).

As to the first prong, West does not pinpoint what information he believes he is entitled to under his interpretation of NEPA. See Fed. Defs.' Second MTD at 11; see also Pl.'s Opp'n at 11 (stating "NEPA confers a right to informed decision-making through the preparation of a lawful, project-specific environmental impact statement where required" without articulating the

agency's failure to prepare an environmental impact statement," regardless of whether he could "establish with any certainty that the statement will cause the license to be withheld or altered" and despite the completion of the dam being "many years" away. Lujan, 504 U.S. at 572 n.7. In that hypothetical, the procedural injury is tied to the licensing decision for the dam's construction. But here, West is challenging a much earlier step in the causal chain. That disconnects NOAA's decision from any concrete injury West would hypothetically face due to construction work on the Deschutes Project.

specific information that he is entitled to under NEPA). Liberally construing the SAC and West's other filings, the Court presumes West is referring to the creation of an EIS and the various associated public-notification requirements. See, e.g., 42 U.S.C. §§ 4332(2)(C), 4336a(c); 40 C.F.R. §§ 1501.3(b) 1501.5(f), 1501.6(b), 1501.9, 1501.11(b)(1), 1501.12, 1502, 1503.1(a)(2)(v), 1507.4 (2025).

In any case, West's allegations fail the second prong of the test for informational injury, as he does not adequately explain how he suffers a specific harm from the denial of information that he would receive through an EIS. It is certainly true that the "informational role" of an EIS under NEPA is to "give[] the public the assurance that the agency 'has indeed considered environmental concerns in its decisionmaking process,' and, perhaps more significantly, [to] provide[] a springboard for public comment." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989) (quoting Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council, Inc., 462 U.S. 87, 97 (1983)). In that sense, West does allege some generalized harm based on his claim that an adequate EIS was not prepared. But informational injury alone is insufficient to sustain an individual plaintiff's standing in a NEPA case because "[i]f one of NEPA's purposes is to provide information to the public, any member of the public—anywhere—would seem to be entitled to receive it." Found. on Econ. Trends v. Lyng, 943 F.2d 79, 84–85 (D.C. Cir. 1991); see also id. at 85 (citing the Supreme Court's rejection of "undifferentiated and common" informational injuries as a basis for standing in United States v. Richardson, 418 U.S. 166, 176–80 (1974)); Ctr. for Biological Diversity v. Bernhardt, 490 F. Supp. 3d 40, 49 (D.D.C. 2020) (explaining that some "differentiating harm" was necessary to confer standing based on an informational injury under NEPA, as otherwise, the informational injury would "amount[] to no more than 'a mere interest'" in the environmental harm at issue, "which does not suffice for

Article III standing"). Here, West "do[es] not allege a deprivation of information under NEPA any greater than that which is suffered by the general public," Ctr. for Biological Diversity, 490 F. Supp. 3d at 49, including by other individuals who live in the area. Accordingly, West cannot successfully assert standing based on any alleged informational injury suffered.

*2. Prudential Ripeness*

Beyond Article III standing, Federal Defendants also argue that "any theoretical further federal action related to the full removal of the 5th Avenue Dam is not ripe." Fed. Defs.' Second MTD at 9.[8] The Court agrees that regardless of whether West has Article III standing, his claim is not prudentially ripe, at least as to his alleged environmental injuries.

Article III requires that the case or controversy be ripe for the Court's review. Ripeness has both constitutional and prudential dimensions. See, e.g., Am. Petroleum Inst. v. EPA, 683 F.3d 382, 386 (D.C. Cir. 2012). The "basic rationale" for *prudential* ripeness "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," as well as "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Lab'ys v. Gardner, 387 U.S. 136, 148–49 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). Moreover, allowing the agency to complete its administrative decision-making "can at least solidify or simplify the factual context and narrow the legal issues at play," promoting judicial efficiency and avoiding "unnecessary 'piecemeal review.'" Am. Petroleum Inst., 683 F.3d at 387 (quoting Pub. Citizen

[8] While Federal Defendants' papers only briefly touch on the question of ripeness, "even in a case raising only prudential concerns, the question of ripeness may be considered on a court's own motion." Nat'l Park Hosp. v. Dep't of Interior, 538 U.S. 803, 808 (2003) (citing Reno v. Cath. Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993)).

Health Rsch. Grp. v. FDA, 740 F.2d 21, 30 (D.C. Cir. 1984)). To assess whether a case is prudentially ripe, the Court must consider two separate factors: (1) "the 'fitness of the issues for judicial decision'"; and (2) "the extent to which withholding a decision will cause 'hardship to the parties.'" Id. (quoting Abbott Lab'ys, 387 U.S. at 149). In NEPA cases, courts look to whether the agency has committed an "'irreversible and irretrievable commitment[] of resources' to an action that will affect the environment." Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 49 (D.C. Cir. 1999) (quoting Mobil Oil Corp. v. FTC, 562 F.2d 170, 173 (2d Cir. 1977)).

As to West's alleged environmental injuries, his first claim fails both prongs of the inquiry.[9] As discussed above, while West alleges several injuries to his environmental interests, there is no evidence before the Court that these injuries will come to pass due to the challenged actions taken by either Federal or State Defendants. It does not matter that "NOAA funds have been obligated and are being spent," nor that "design and modeling work is underway," as West submits. Pl.'s Opp'n at 19. Instead, West's injuries will only manifest if State Defendants move forward with permitting and construction. They will also depend on the precise details of any potential construction. As previously noted, Federal Defendants do not commit themselves to any future funding in the Cooperative Agreement because its only purpose is to engage in conceptual-design work to determine further details of the Project. See NEPA Inclusion

[9] The analysis for West's procedural and informational injuries is less clear cut. To the extent West *has* suffered a procedural or informational injury, those injuries have already manifested due to the alleged failures to engage in required statutory procedures or to publicize statutorily required information. In that sense, these issues could be fit for judicial review. Postponing any decision on the matter might also cause the parties various hardships. However, the Court does not address whether West's procedural or informational injuries are prudentially ripe because without a prudentially ripe environmental injury, any procedural- or informational-injury theories of standing would fail, as discussed in Sections III.A.1.b–c, supra.

Analysis at 1–2. While there was an "irreversible and irretrievable commitment[] of resources" by NOAA, Wyo. Outdoor Council, 165 F.3d at 49 (citation omitted), those resources have been committed only to that preliminary design work, not to any later construction. At this stage, the Court cannot know whether West will ever suffer the alleged environmental injuries because that will depend on future contingencies. Construction cannot even begin until the state receives permits from federal, state, and local agencies, and those permits have yet to be obtained. See Wash. State Dep't of Ecology & Dep't of Enter. Servs., History, supra (noting that "permitting . . . is expected to be complete in mid-2027"). This further renders West's claim prudentially unripe. See Texas v. United States, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (internal quotation marks omitted) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580–81 (1985))). The Court declines to speculate whether the state will obtain the permits that would be required for West to actually suffer the injuries he now alleges. It therefore concludes that even if West did have standing to allege environmental injuries under the APA, the Court would still lack subject matter jurisdiction because that claim is not prudentially ripe.

B. Claims II and IV

West brings Claims II and IV under the APA, challenging actions by State Defendants only.[10] While State Defendants (unhelpfully) do not address either claim in their joinder adopting Federal Defendants' motion to dismiss, the Court will *sua sponte* dismiss both counts

[10] While West does suggest in his opposition that Federal Defendants took relevant actions pertaining to Claim II, see, e.g., Pl.'s Opp'n at 14, 15, the facts in the SAC and exhibits attached to other filings contradict such an inference. Therefore, the Court does not consider the unsupported allegations about Federal Defendants' actions here and only determines the viability of Claims II and IV against State Defendants. See supra note 5.

for failure to state a claim because West does not have a valid cause of action against State Defendants under the APA.[11]

Because NEPA itself "does not create a private right of action," claims alleging violations of NEPA must instead be brought under the APA. Pub. Citizen v. Off. of U.S. Trade Representatives, 970 F.2d 916, 918 (D.C. Cir. 1992); see Karst Env't Educ. & Prot., Inc. v. EPA, 475 F.2d 1291, 1295 (D.C. Cir. 2007). The APA provides a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. As relevant here, the APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." Id. § 704; see also Pub. Citizen, 970 F.2d at 918 (explaining that because all NEPA claims are subject to the requirements of the APA, the plaintiff must allege a "final agency action"); Karst Env't Educ. & Prot., Inc., 475 F.2d at 1295 (same). In NEPA cases, that final agency action is a "major Federal action," see Karst Env't Educ. & Prot., Inc., 475 F.2d at 1275, which is defined as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility," 42 U.S.C. § 4336e(10)(A). Excluded from that

[11] The Court also notes that even if West did have a cognizable cause of action for Claims II and IV, venue likely would be improper such that those claims would either be dismissed or transferred to a district where venue is proper (*e.g.*, a district in Washington State). See Fed. R. Civ. P. 12(b)(3) (listing improper venue as a ground for a motion to dismiss); 28 U.S.C. § 1391(b) (providing that venue is proper in either "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located" or "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"); 28 U.S.C. § 1406(a) (requiring that the district court, after determining venue is improper, either dismiss or, when it is in the interest of justice, transfer the case to a district where venue would be proper); cf. W. Watersheds Project v. Tidwell, 306 F. Supp. 3d 350, 357 (D.D.C. 2017) ("[V]enue is proper in the local jurisdiction even for cases involving a federal question if the local office of the federal agency was involved in the challenged decision and the agency decision making process occurred in the local jurisdiction.").

definition is any "non-Federal action" with either "no or minimal Federal funding" or "no or minimal Federal involvement where a Federal agency cannot control the outcome of the project." 42 U.S.C § 4336e(10)(B)(i).

Crucially, the APA's judicial review provisions define "agency" to mean *federal* agencies exclusively. 5 U.S.C. § 701(b) (defining "agency" as "each authority of the Government of the United States"); see Karst Env't Educ. & Prot., Inc., 475 F.2d at 1298 ("[N]othing in the APA authorizes claims against nonfederal entities[.]"); see also Mwabira-Simera v. Howard Univ., 692 F. Supp. 2d 65, 70 (D.D.C. 2010) (explaining that "[t]he APA applies only to agencies of the federal government" and therefore dismissing a claim against non-federal agencies under Rule 12(b)(6) for failure to state a claim upon which relief may be granted). Therefore, to assert a valid cause of action under the APA, including for a NEPA violation, the plaintiff must seek judicial review of a final action taken by a *federal* agency.

*1. Claim II: 2025 Washington State Budget Provision*

West alleges in Claim II that Section 3031—a 2025 Washington State budget provision appropriating $14.75 million to DOE to advance the Deschutes Project—is unlawful because Defendants failed to engage in the required review under NEPA and SEPA. See SAC ¶¶ 5.2.1–5.2.9. Construing West's *pro se* complaint liberally, the Court assumes that he is asserting a cause of action under the APA, despite calling Claim II a NEPA claim. See id.

The relevant agency action here is the Washington State Legislature's budget appropriation to DOE for the Deschutes Project, which West believes violated NEPA by "direct[ing] DOE to rely on past reports and studies rather than conducting new comprehensive environmental review," id. ¶ 5.2.2, "appropriating funds and dictating project elements" without completing the review procedures required by NEPA, id. ¶ 5.2.3, and "fragment[ing] review by

isolating bridge removal, dredging, and estuary construction from the larger project," id. ¶ 5.2.4. But this agency action cannot form the basis for an APA challenge. For one, the only "final" action that has been taken was by the Washington State Legislature. Not only is the Washington Legislature not a *federal* agency—it is not even a state agency. Cf. 5 U.S.C. § 701(b)(1)(A) (excluding Congress from the definition of agency in the APA's judicial review provisions). And any state appropriation in Section 3031 would not constitute a "major Federal action" that is subject to NEPA. See 42 U.S.C. §§ 4332, 4336e(10)(B)(i).[12]

Therefore, West's second claim must be dismissed under Rule 12(b)(6) for failure to state a claim under the judicial review provision of the APA.

2. *Claim IV: Misrepresentation and Concealment in State Defendants' Joinder*

Claim IV fails for similar reasons. West alleges that State Defendants engaged in various forms of obfuscation in their papers adopting Federal Defendants' motion to dismiss, including misrepresenting and concealing State Defendants' role in the Cooperative Agreement, their "control of federal funds," and "substantive commitments undertaken." SAC ¶ 5.4.2. West also claims State Defendants made various omissions, failing to mention the state budget appropriations and "DES's contemporaneous LOIs seeking . . . additional federal and state funding and merging the flood-protection berm into the estuary restoration project." Id. ¶¶ 5.4.5, 5.4.6. According to West, these actions "fall within the APA's prohibition" on "agency action

[12] West argues in his opposition that "[w]here federal agencies adopt, rely upon, or facilitate state mandates that predetermine outcomes or truncate NEPA review, those mandates become part of the challenged major federal action." Pl.'s Opp'n at 14. But, as Federal Defendants point out, West does not provide any "link between the State's proviso and any federal action, much less NOAA's Cooperative Agreement" such that the budget provision can serve as the basis of an APA claim. Fed. Defs.' Reply to Pl.'s Opp'n to Fed. Defs.' Mot. to Dismiss, ECF No. 39 at 3 (citing Appalachian Voices v. Bodman, 587 F. Supp. 2d 79, 87–88 (D.D.C. 2008); Fla. Audubon Soc'y, 94 F.3d at 663, 679–80). And the Court need not accept West's unsupported assertions of federal involvement. See supra note 5.

that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. ¶ 5.4.9 (citing 5 U.S.C. § 706(2)(A)).

The relevant agency action here, then, is State Defendants' statements in their papers adopting Federal Defendants' motion to dismiss. Not only were these statements made by a state agency, thus depriving West of an APA cause of action, but the statements themselves do not fall under the APA's definition of agency action. See 5 U.S.C. § 551(13) (defining agency action as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"). Furthermore, the statements would have to constitute a "major Federal action" for a claim to lie under NEPA. See 42 U.S.C. § 4332. Obviously, they do not. Claim IV thus fails thrice over.

To the extent West's complaint could be (very) liberally construed to challenge any LOI itself under the APA for violating NEPA, it would still fail to state a cause of action. The particular LOI discussed by West is a pre-proposal that was submitted by DES for a grant from the National Fish and Wildlife Foundation's NCRF. Because the NCRF "is a partnership between the National Fish and Wildlife Foundation and NOAA," Off. for Coastal Mgmt., supra, any funding decision *could* potentially constitute a "major Federal action" such that this claim would be reviewable under NEPA. Cf. 42 U.S.C. § 4336e(10)(A), (B)(i) (excluding only those actions from the definition of "major Federal action" where there is "no or minimal Federal involvement where a Federal agency cannot control the outcome of the project"). However, West does not allege that State Defendants ever *received approval* for that funding. Without any facts suggesting that State Defendants received these federal funds, there is no final agency action in the form of a "major Federal action" because "there is a wide gulf between what a state

may want and what the federal government is willing to provide." Macht v. Skinner, 916 F.2d 13, 17 (D.C. Cir. 1990) (citation omitted).

Claim IV, accordingly, also fails to state a claim under the judicial review provision of the APA.

C. Claim III: Declaratory Judgment Act

Finally, West seeks relief under the Declaratory Judgment Act based on what he alleges is "[a]n actual, ripe, and justiciable controversy [that] exists between Plaintiff and Defendants concerning the lawfulness of Defendants' actions under NEPA, SEPA, and the APA." SAC ¶ 5.3.2.

The Declaratory Judgment Act "is not an independent source of federal jurisdiction." Ali v. Rumsfeld, 649 F.3d 762, 778 (D.C. Cir. 2011) (quoting C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth., 310 F.3d 197, 201 (D.C. Cir. 2002)). Instead, the Act "is procedural only," Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950) (quoting Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240 (1937)), as "Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction," id. The Act provides for those enlarged remedies "[i]n a case of actual controversy within [the court's] jurisdiction." 28 U.S.C. § 2201.

If a court otherwise lacks jurisdiction over a plaintiff's claims, then it will also lack subject matter jurisdiction over a claim asserted under the Declaratory Judgment Act. See Miriyeva v. U.S. Citizenship & Immigr. Servs., 9 F.4th 935, 945 (D.C. Cir. 2021); see also Lovitky v. Trump, 949 F.3d 753, 758–59 (D.C. Cir. 2020) ("Thus, '[r]esort to the Declaratory Judgment Act will not fill a gap in subject matter jurisdiction.'" (alteration in original) (quoting 14 Helen Hershkoff, Federal Practice & Procedure § 3655 (4th ed. 2019))). This Court lacks

jurisdiction over Claim I against Federal and State Defendants under the APA because West lacks standing. See supra Section III.A. Therefore, without an independent basis for jurisdiction over Claim I, the Court has no jurisdiction to issue declaratory relief under the Declaratory Judgment Act. Claim III must therefore be dismissed under Rule 12(b)(1).

Moreover, the Declaratory Judgment Act does not provide a plaintiff with a cause of action, Ali, 649 F.3d at 778, because "the availability of [declaratory] relief presupposes the existence of a judicially remediable right," C&E Servs., Inc. of Wash., 310 F.3d at 201 (quoting Schilling v. Rogers, 363 U.S. 666, 677 (1960)). Without a cognizable cause of action for Claims II and IV, see supra Section III.B, West therefore cannot rely on the Declaratory Judgment Act to supply him with one, and Claim III must be dismissed under Rule 12(b)(6).

## IV. Conclusion

For the foregoing reasons, the Court will grant Federal Defendants' Motion to Dismiss and State Defendants' Joinder in Federal Defendants' Motion to Dismiss and will dismiss all claims in this case. West's Motion for a Preliminary Injunction and Motion to Supplement the Record and for Judicial Notice of Adjudicative Facts are denied as moot. A separate Order shall accompany this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: September 30, 2026